UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALLIANZ CORNHILL INTERNATIONAL § <br> SUBSCRIBING TO POLICY § <br> NO. 576/UE6156500, § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> GREAT LAKES CHEMICAL § <br> CORPORATION, § <br> § <br> Defendant. § | CIVIL ACTION NO. H-04-1668 |

**MEMORANDUM & ORDER**

Pending before the Court are Plaintiff/Counter Defendant Allianz Cornhill International's ("Allianz") Motion for Summary Judgment Seeking Policy Interpretation (Dkt. #12) and the Defendant/Counter Claimant Great Lakes Chemical Corporation's ("GLCC") Motion for Partial Summary Judgment (Dkt. #13).  For the reasons discussed below, the Court DENIES Allianz's motion and GRANTS GLCC's motion.

**Factual and Procedural Background**

This suit involves the interpretation of an insurance contract.  Allianz insured GLCC under a Global Property/Boiler Insurance Policy No. 576/UE6156500 (the "Policy") that was in effect from March 31, 2000 to March 31, 2001.  There is no dispute as to the following facts.[1]  GLCC manufactures chemicals in Union County Arkansas, near the town of El Dorado.  GLCC has three separate plants in the area at which GLCC manufactures elemental bromine and derivative products containing elemental bromine.  GLCC uses bromine-enriched saltwater brine as a raw material in

---

[1] The facts in this section stem largely from the parties Agreed Stipulation of Facts in Connection with Simultaneous Motions for Summary Judgment ("Stipulation") ( *See* Dkt. #14*).*

its plants. GLCC extracts the brine from underground aquifers underlying Union County and other surrounding counties in Arkansas by using wells that it owns. Electrically powered REDA pumps, located about 2,000 feet below the ground's surface are used to pump the brine to the surface. Once the brine reaches the surface, it enters an extensive 250-mile pipeline network owned and operated by GLCC. The pipelines, operated by electronically powered pumps, deliver brine to GLCC plants where the bromine ions are extracted.

The events giving rise to this lawsuit stem from two different ice storms that struck Union County causing extensive power outages. The first storm hit Union County on December 13, 2000 and caused damage to various pieces of GLCC equipment including a chiller, power lines, and poles that delivered electricity to the various wells, pipelines, and REDA pumps. Power was restored to the wells in GLCC's west field by December 24, 2000. The second ice storm hit Union County on December 25-26, 2000 and also disrupted electrical service throughout portions of the area.

Power outages cause the REDA pumps to shutdown requiring them to be restarted. The REDA pumps, however, have a limited lifetime of approximately 20 re-starts. When the pumps ultimately fail, they have to be rebuilt or replaced. GLCC's wells could not pump brine during the periods when a particular REDA pump was non-operational. Less brine was therefore delivered to GLCC's manufacturing plants. This caused a corresponding reduction in the volume of products GLCC could manufacture and sell.

After the storms, GLCC filed a claim with Allianz for business interruption. The parties agree that, though electricity was available to the REDA pumps, the pumps were inoperable due to mechanical failure caused by reaching the maximum life expectancy resulting from the power outages caused by the storms.

The parties further agree that coverage was available under the Policy for the majority of

GLCC's losses, including some business interruption losses and property damage losses. The parties also agree that the two ice storms represent two separate occurrences under the Policy, requiring GLCC to satisfy the deductible twice. There remain, however, two unresolved legal issues. The first is whether there is coverage under the Policy for the remaining portion of GLCC's business interruption losses. The second issue is the proper deductible to be applied to each occurrence.

Allianz brought the present action against GLCC, claiming diversity jurisdiction, seeking interpretation of the terms of its contract with GLCC. Allianz filed a Motion for Summary Judgment Seeking Policy Interpretation (Dkt. #12) and GLCC then filed its Motion for Partial Summary Judgment (Dkt. #13).

**Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex*., 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id*. at 322.

If the moving party fails to meet this burden, then they are not entitled to summary judgment and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323-25. To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Yaquinto v. Segerstrom* (*In re Segerstrom*), 247 F.3d 218, 223 (5th Cir. 2001); *see also Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**Discussion**

**I.     Applicable Law**

The laws of three states were potentially implicated pursuant to the transaction between Allianz and GLCC: (1) Texas, where the policy was brokered; (2) Indiana, where GLCC is based; and (3) Arkansas, where the events giving rise to GLCC's claim took place. Under the *Erie* doctrine, choice of law rules are substantive rather than procedural, and therefore federal courts in diversity cases apply the same choice of law rules that the local state courts would apply. *See Jackson v. West Telemarketing Corp. Outbound*, 245 F.3d 518, 521 (5th Cir. 2001) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496-97 (1941)). Therefore, Texas choice of law rules will be applied.

A Texas state court must make a conflicts-of-laws decision only when the case is connected with more than one state *and* the laws of the states in question differ on one or more points at issue. *See Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 650 (Tex. App.–Houston [14th Dist.] 1995, writ dism'd w.o.j.) (holding burden is on party asserting application of foreign law to first show existence of true conflict of laws and then demonstrate which law should apply; in absence of such showing, it is presumed other states' laws are same as Texas law) (emphasis added), *abrogated on other grounds by Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 351-52 (Tex. App.–Houston [14th Dist] 2003, no pet.). The parties have acknowledged that, as applied to the case at bar, there is no difference between the laws of Texas, Indiana, and Arkansas.[2] Therefore, the Court will apply Texas law.

Texas courts interpret insurance contracts under the same rules that apply to contracts

---

[2] *See* GLCC's Motion for Partial Summary Judgment at pg. 6 ("there is no need to undertake a choice of law analysis to resolve the present dispute, because there are no differences among the laws of Indiana, Arkansas, or Texas on the fundamental principles of contract interpretation which should be applied."). *See also* Allianz's Motion for Summary Judgment Seeking Policy Interpretation at pg. 2 ("since this case involves interpretation of a contract, a review of the law in each jurisdiction results in the same legal analysis.").

5

generally. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). In interpreting an insurance policy, the court's primary concern is to give "effect to the written expression of the parties' intent." *Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.*, 894 S.W.2d 401, 405 (Tex. App.–Fort Worth 1994, writ denied). In examining a summary judgment ruling relating to the construction of an insurance contract, the court must first determine whether the applicable policy terms are ambiguous. *See Canutillo Indep. School Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996) (citing *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 917 (Tex. App.–Fort Worth 1988, writ denied)).

A contractual provision is ambiguous if its meaning is uncertain and it is found to be susceptible to more than one reasonable interpretation. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Any ambiguity in a contract is resolved by adopting a construction that most favors the insured. *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). If multiple interpretations are reasonable, the court must construe the contract against the insurer, and this applies particularly when exceptions to liability are examined. *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 769 (5th Cir. 1999) (citing *Western Heritage Ins. Co. v. Magic Years Learning Centers and Child Care, Inc.*, 45 F.3d 85, 88 (5th Cir. 1995)). "These special rules favoring the insured, however, are applicable only when there is an ambiguity in the policy; if the exclusions in question are susceptible to only one reasonable construction, these rules do not apply." *Canutillo*, 99 F.3d at 701. Whether a provision is ambiguous is a question of law. *See Candlelight Hills Civic Ass'n, Inc. v. Goodwin*, 763 S.W.2d 474, 477 (Tex. App.–Houston [14th] 1988, writ denied). The following section evaluates the terms of the policy for any ambiguities and construes those terms under the applicable law.

**II.     Coverage under the Policy**

GLCC seeks business interruption coverage under two different provisions of the contract. Clause 7.B.1.a., under the heading entitled "Coverage," deals with losses resulting from business interruption. That clause states:

> Subject to all its provisions, this policy insures against loss resulting directly from necessary interruption of business caused by physical loss or damage of the type insured against to real or personal property.

Clause 8.A.2., under the heading entitled "Extensions of Coverage," requires damage to property owned by the utility company. That provision states:

> A. This policy, subject to all its provisions and without increasing the amount of said policy, also insures against loss resulting from, damage to or destruction by the perils insured against to:
> . . .
>
> 2. Utility services from all utility suppliers by reason of any accidental occurrence to the facilities of those suppliers which immediately prevents in whole or in part the delivery of usable services to any insured location.
> . . .
> . . .

Allianz argues that Clause 7.B.1.a. is not ambiguous and does not provide business interruption coverage because the REDA pumps are expressly excluded from coverage under Clause 10.K. Allianz suggests that Clause 7.B.1.a. requires business interruption to result from damage to property covered under the Policy because it limits coverage to "loss or damage of the type insured against" and begins with the limitation "[s]ubject to all its provisions, this policy insures against . . . ." The parties have stipulated that "REDA pumps are 'property whilst downhole' as that phrase is defined in ¶10.K of the policy."[3] Clause 10.K, under the heading entitled "Property Excluded," states that the policy does not cover property "whilst offshore and/or downhole." Allianz argues that, because the sole basis of GLCC's business interruption claim is due to the failed REDA pumps,

---

[3] Stipulation, pg. 3, para 9. But GLCC does not stipulate or agree that Clause 10.K is relevant to its claim to recover its remaining business interruption losses.

which are excluded, Clause 7.B.1.a. cannot and does not provide coverage.

In support of its argument, Allianz directs the Court to Section 5, entitled "Perils Insured," which states that "[t]his policy insures against all risks of direct physical loss or damage to property including [sic] hereunder except as hereinafter excluded." Allianz argues that Clause 10.K is just such an exclusion and that the REDA pumps, located 2,000 feet below ground, fall squarely within the definition of property "whilst ... downhole." Allianz argues that the plain meaning of Section 5, Clause 10.K, Clause 7.B.1.a taken together unambiguously excludes the damage to the REDA pumps from coverage.

In sum, Allianz's argument is essentially that Clause 7.B.1.a., which requires "physical loss or damage of the type insured against to real or personal property," requires that *insured* property be damaged before GLCC is entitled to business interruption losses. Since the REDA pumps are excluded from coverage under Clause 10.K, Allianz argues that there can be no consequent coverage for business interruption under Clause 7.B.1.a.

Conversely, GLCC argues that there is a more reasonable interpretation than that offered by Allianz. According to GLCC, the phrase "of the type insured against" modifies "physical loss or damage," rather than "real or personal property." GLCC argues that there are two reasons why the phrase cannot mean physical loss or damage exclusively to *property* insured under the Policy. First, the phrase does not say that. Second, GLCC argues that, where Allianz wanted to limit coverage to insured property only, its Policy said so explicitly. Clause 7.B.1.c., for instance, states that to recover for interruption of research and development activities, there must be loss or damage to "property as described in Clause 7.A." GLCC notes that the absence of such a statement in 7.B.1.a. indicates that the exclusion in Clause 10.K is entirely irrelevant.

Moreover, GLCC goes on to suggest that the phrase "of the type insured against" must refer

8

to the types of losses or damages that are insured against, which are described in Section 5, "Perils Insured," as "all risks of direct physical loss or damage to property including [sic] hereunder except as hereinafter excluded." GLCC argues that, because Allianz had already paid the majority of GLCC's claims for damages resulting from the ice storms, Allianz has already conceded that the ice storms were insured perils under Section 5 and therefore under Clause 7.B.1.a. Therefore, GLCC argues, the Court should order Allianz to pay GLCC's remaining claims.

The relevant question presented to the Court is whether Clause 7.B.1.a. and Section 5 are ambiguous provisions. If they are ambiguous, the Court must construe the contract in a light that most favors GLCC. *See National Union Fire Ins. Co.*, 811 S.W.2d at 555. The provision will be found to be ambiguous if its meaning is uncertain and it is found to be susceptible to more than one reasonable interpretation. *See Coker*, 650 S.W.2d at 393. In determining whether the clauses are ambiguous the Court deems it necessary to examine the language of the provisions.

Were GLCC claiming proceeds for damage to the REDA pumps themselves or their replacement, such claims would clearly be excluded pursuant to the unambiguous language of Clause 10.K. GLCC, however, is not claiming coverage for direct physical damage to its REDA pumps, but for the losses it incurred as a result of the stoppage of business when the "REDA pumps were unable to operate due to mechanical failure caused by reaching the maximum life expectancy due to the power outages caused by the storms."[4] There are thus two pivotal issues at bar: (1) whether the phrase "of the type insured against" makes an internal reference to Clause 10.K or Section 5; and (2) whether Section 5 independently cross-references Clause 10.K. The Court will address each issue in turn.

The Court finds that Clause 7.B.1.a. is not ambiguous. The Court finds that the phrase "of

---

[4] Stipulation, pg. 2, para. 7.

the type insured against" modifies "physical loss or damage," rather than "real or personal property." Therefore, the Clause makes reference to Section 5, not Clause 10.K. This interpretation finds support in the wording used in Clause 7.B.1.c., wherein Allianz was explicit when it intended to cover only insured property.

However, the Court finds the phrase "as hereinafter excluded" in Section 5 to be ambiguous. The first sentence under Section 5 provides that the "policy insures against all risks of *direct* physical loss or damage to property including [sic] hereunder except as hereinafter excluded" (emphasis added). The phrase "as hereinafter excluded" carries two possible meanings. It could mean that the Policy "insures against all risks of direct physical loss or damage to property including [sic] hereunder except *[such property]* as hereinafter excluded." Alternatively, it could mean that the Policy "insures against all risks of direct physical loss or damage to property including [sic] hereunder except *[such risks]* as hereinafter excluded."

Therefore, under the common law doctrine of *contra proferentum* applied to insurance contract under Texas law,[5] the Court will construe the ambiguity of Section 5 in favor of the insured. As such, Section 5 does not limit losses to property not excluded by Clause 10.K and, consequently, coverage under Clause 7.B.1.a. extends to the business losses suffered by GLCC as a result of the failure of the REDA pumps.

In order to recover, GLCC must demonstrate that the ice storm–a covered peril–was the proximate cause of the business interruption losses. Under Texas law, the issue of proximate cause is generally a question of fact. *See Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970). However, it may be decided as a matter of law "where the circumstances are such that in the opinion of the court reasonable minds could not arrive at a different conclusion." *Cave v. Texas & Pacific Railway*

---

[5] *Travelers Indem.*, 166 F.3d at 769.

*Company*, 296 S.W.2d 558, 560 (Tex. Civ. App., Eastland 1956, writ ref'd n.r.e.).[6]

In *de Laurentis v.United Servs. Auto. Ass'n*, 162 S.W.3d 714, 723 (Tex.App.-Houston [14th Dist.] 2005, pet. filed), a Texas Court of Appeals determined that a "physical loss" as opposed to a "direct physical loss," included the natural consequences of a named peril. *Id.* at * 6 (citing *Travelers Indem. Co. v. Jarrett*, 369 S.W.2d 653, 655 (Tex. App.–Waco 1963, no writ). Quoting *Travelers* as an example, the court noted:

> Where insurance against property damage is only against "direct" loss by lightning it has been said the quoted term means "immediate" or "proximate," as distinguished from remote or incidental causes. But a provision insuring against "loss or damage caused by lightning" renders the insurer liable for all known effects of lightning, "and includes all loss or damage which results as a direct and natural consequence of the lightning, notwithstanding other incidental agencies may be instrumental in adding to the loss or damage."

*Id.* (quoting *Travelers*, 369 S.W.2d at 655 (quoting 11 Couch, Insurance 2d, Secs. 42.355, 42.357; 15 A.L.R.2d 1024)).

The policy in question in *de Laurentis* insured against "physical loss to the property . . . caused by a peril listed below." *Id.* at 721. The insured sought coverage for mold damage. The growth of mold was caused by a leaking air conditioning unit. The insurer argues that the damage was caused by mold, not the leaking air conditioning unit. The court disagreed with the distinction made by the insurer and held that the named peril (i.e., accidental discharge, leakage, or overflow of water from within an air conditioning system) caused the mold in question, and, therefore, the resulting mold damage was a physical loss covered under the policy. *Id.* at 721, 724-25.

In the case at bar, Section 5 states that the Policy "insures against all risks of direct physical

---

[6] Though the two cases cited were negligence cases, the Court is of the opinion that the same reasoning used in those cases enables the Court to decide the issue of proximate cause in the case at bar. Proximate cause is not a legal doctrine exclusive to negligence-based causes of action.

loss or damage to property." The Court recognizes that the storm itself did not cause the REDA pumps to fail. Rather, as stipulated by the parties, the pumps failed because they reached their "maximum life expectancy due to the power outages caused by the storms."[7] Put more simply, a covered peril–the ice storms–caused power outages, which in turn caused the pumps to fail, resulting in business interruption. In other words, here there are three links in the causation chain leading to the business interruption losses: (1) storms, (2) power outages, and (3) pump failure.

The United States Supreme Court has held that all consequences naturally flowing from a peril insured against are properly attributable to that peril. *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556, 565, 58 S. Ct. 371, (1937). Similarly, the Texas Supreme Court has noted its approval of an annotation in 23 A.L.R.2d 385, at page 405, as follows:

> The test applied under the rule of proximate cause seems to be that where, and only where, an insured peril sets other causes in motion which in unbroken sequence and connection produce the final result for which the insured seeks to recover under his policy, the peril insured against will be regarded as the direct and proximate cause of the entire loss, so as to render the insurer liable for the entire loss within the limits fixed by the policy. The rationale behind this rule is that the scope of insurance protection is defined by the application of the proximate cause standard, according to which a specified loss is compensable if and only if caused by a peril covered by the policy.

*United States Ins. Co. of Waco v. Boyer*, 269 S.W.2d 340, 343 (Tex. 1954). There can be no reasonable doubt, that the ice storm–an insured peril–set in motion other causes which, in unbroken sequence, produced the business interruption losses claimed by GLCC. The ice storms interrupted electricity services causing the pumps to fail, which in turn caused less brine to be delivered to GLCC's plants and, consequently GLCC suffered business interruption losses. In light of the simplicity of this chain of events, the Court finds that the only reasonable conclusion is that proximate causation has been established. See *Cave,* 296 S.W.2d at 560.

---

[7] Stipulation, pg. 2, para. 7.

Finally, because the Court has determined that there is coverage under Clause 7.B.1.a. for GLCC's business interruption losses, it is not necessary for the Court to address GLCC's rights under Clause 8.A.2.

### III.     Amount of Deductible

The parties also dispute the proper deductible to be applied to the damage resulting from the ice storms. Section 4 of the main Policy, entitled "Deductible" states:

> US$ 1,000,000 per occurrence except
> US$ 500,000 per occurrence in respect of non-manufacturing location.

Prior to the date of the two ice storms, two endorsements were added to this Policy. Endorsement No. 1 superseded and replaced the standard deductible for the El Dorado Location. Endorsement No. 1 consisted of the following:

> It is understood and agreed that the deductible for the El Dorado location is increased to US$5,000,000 each and every loss, until such time as the risk recommendations have been completed. . . .

Upon the successful completion of the risk recommendations, Allianz issued Endorsement No. 4, which states:

> It is hereby noted and agreed that with effect from 1st September 2000, the deductible of US$5,000,000 each and every loss applicable to the El Dorado Plant is reduced to US$1,000,000 each and every loss, following the completion of various risk recommendations including removal of PCB's.

Under Texas law, "[a]n endorsement cannot be read apart from the main policy, and the added provisions will supersede the previous policy terms to the extent they are truly in conflict." *Primrose Operating Co. v. National American Ins. Co.,* 382 F.3d 546, 558 (5th Cir. 2004) (quoting *U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 243 F. Supp.2d 652, 661 (W.D. Tex. 2001).

The parties agree that the two ice storms represent two separate occurrences requiring GLCC to satisfy the deductible twice.[8] GLCC argues that the proper deductible to be applied to each occurrence is $500,000. It argues that the ice storms were occurrences "in respect of non-manufacturing locations." GLCC suggests that it is undisputed that no manufacturing takes place at the brine field. The parties have stipulated that the first step of the manufacturing process occurs at the plants, after the brine has been extracted from the ground and delivered to the plants through the pipelines.[9] GLCC thus argues that, because the brine fields are a "non-manufacturing location" under any possible interpretation of the phrase, the lower deductible should apply.

By contrast, Allianz argues that the proper deductible to be applied is $1,000,000 per occurrence. This argument is based on the assertion that the entire El Dorado facility was considered one location and apparently without distinction between manufacturing or non-manufacturing locations. It argues that Endorsement No. 1 evinces an intent to treat everything as one location, only indicating one deductible of $5,000,000. It also suggests that Endorsement No. 4 confirms that the deductible was reduced to $1,000,000 for the entire facility.

The Court finds Allianz's arguments to be unpersuasive. First, contrary to Allianz's assertions, GLCC never stipulated that "the *entire facility* is a manufacturing location" (emphasis added). The relevant language reads,

> [GLCC's] business includes chemical manufacturing in Union County, Arkansas *near the town of El Dorado*. At three separate manufacturing

---

[8] Stipulation, pg. 3, para. 10.

[9] Stipulation, pg. 1-2, para. 3.

14

      plants in the area, GLCC manufactures elemental bromine and many derivative products which contain elemental bromine. . . .

(emphasis added). If anything, GLCC only stipulated to the fact that its business includes three manufacturing plants near the town of El Dorado.[10]

      The reference in Endorsement No. 1 to "the El Dorado location" is undefined. Furthermore, the policy fails to define a "non-manufacturing location." The reference to "the El Dorado location" in Endorsement No. 1 is ambiguous as to whether it includes the REDA pumps located in the brine fields miles from the El Dorado plant.

      To resolve this ambiguity, the Court finds it useful to look at Endorsement No. 4. That endorsement reduced the $5,000,000 deductible to $1,000,000, the standard deductible applied to manufacturing plants. This reduction indicates that the parties never intended Endorsement No. 1 to alter the $500,000 deductible applied to non-manufacturing locations.

      Contrary to Allianz's assertion that Endorsement No. 4 confirms that the deductible was reduced to $1,000,000 for the *entire facility*, the language of the endorsement specifically states that "each and every loss applicable to the El Dorado *Plant* is reduced to US$1,000,000" (emphasis added). If Allianz intended the $1,000,000 deductible to apply to the entire El Dorado location, it seems unlikely that the language of the endorsement would specify "Plant."

      Allianz also relies upon email communications between various GLCC employees to suggest that, after the risk recommendations were completed, GLCC intended for the deductible at the entire El Dorado location to be $1,000,000. The Court finds these emails

---

[10] *See* Stipulation, pg. 1, para. 1.

unpersuasive. For instance, Exhibit C to Allianz's response to GLCC's motion for summary judgment, dated September 1, 2000, is an email from GLCC employee Steve Brewer stating:

> During our call today to Allianz-London we confirmed all "immediate priority" capital items are now complete (with the removal of the PCB-bearing transformers) and they immediately cut the deductible from a temporary elevated $5mn to $1mn per occurrence.

Allianz argues that this statement confirms that GLCC intended to apply a $1,000,000 deductible to all losses regardless of the location of the damages. However, the Court finds that this email does little more than reiterate the terms of the Endorsement. Furthermore, the specific reference to " the El Dorado *Plant*" in Endorsement No. 4 confirms that the parties intended the original increase in the deductible and its later reduction to apply only to manufacturing locations. The explicit language of Endorsement No. 4 contradicts Allianz's interpretation of Mr. Brewer's email.

As an alternative argument, Allianz argues that Endorsement No. 1 raised the deductible for the entire El Dorado facility to $5,000,000 and Endorsement No. 4 only reduced the deductible for the manufacturing facilities to $1,000,000. Consequently, Allianze contends, the deductible for the non-manufacturing locations remained at $5,000,000 after the adjustment made by Endorsement No. 4. However, construing these ambiguous endorsements against the insurer, as it must, the Court finds that Allianz's suggested reading of those provisions are untenable. As discussed above, reading Endorsement No. 1 in conjunction with the corresponding Endorsement No. 4, the Court maintains that none of the endorsements altered the original deductible of $500,000 applied to non-manufacturing locations.

In sum, the Court finds that the appropriate deductible to be applied to each occurrence is $500,000. Because the brine fields are non-manufacturing locations, the proper deductible to be applied to the consequential damage from the failure of the pumps caused by the ice storms is $500,000 per occurrence.

## Conclusion

For the foregoing reasons, Allianz's Motion for Summary Judgment Seeking Policy Interpretation (Dkt. #12) is DENIED and GLCC's Motion for Partial Summary Judgment (Dkt. #13) is GRANTED.

It is so ORDERED.

Signed this 24th day of March, 2006.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE